## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**JACQUELINE GAIL PAINTER,**

      **Plaintiff,**

v.                                      **Case No.: 2:17-cv-04435**

**NANCY A. BERRYHILL,**
**Deputy Commissioner for Operations,**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13, 14). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED;** the Commissioner's request for judgment on the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED;** and that this case be **DISMISSED** and

1

removed from the docket of the Court.

## I.    <u>Procedural History</u>

On August 20, 2014, Plaintiff, Jacqueline Gail Painter ("Claimant"), completed an application for DIB, alleging a disability onset date of February 18, 2014 due to "Crohns disease, bulging disk in back, joint inflammation not diagnosed yet … [and] [r]eoccuring staph infections." (Tr. at 178-79, 202). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 15). Claimant filed a request for an administrative hearing, which was held on December 15, 2016 before the Honorable M. Drew Crislip, Administrative Law Judge ("ALJ"). (Tr. at 29-65). By written decision dated January 17, 2017, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 15-23). The ALJ's decision became the final decision of the Commissioner on October 4, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 12, 13, 14). Consequently, the issues are fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 48 years old on her alleged disability onset date and 52 years old on December 31, 2017, her date last insured. (Tr. at 22). She completed high school and two years of college and communicates primarily in English. (Tr. at 201, 203). Claimant received specialized training as a real estate agent/home inspector and worked for a short period of time in that profession before stopping work altogether. (Tr. at 202-03). Her

other past relevant work includes jobs in office management and landscaping. (Tr. at 204).

### III.  <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 20, 2013, her alleged disability onset date. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "Crohn's disease, degenerative disc disease of the cervical and lumbar spine, and spinal dysfunction." (Tr. at 17-18, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She can sit for up to six hours in an eight-hour workday, and stand and/or walk for up to six hours in an eight-hour workday. The claimant can frequently reach, handle, and operate hand controls with the right upper extremity. She can frequently operate foot

controls with the right lower extremity. The claimant can never climb ladders, ropes or scaffolds, but can occasionally balance and stoop. The claimant can have no exposure to unprotected heights, moving mechanical parts, extremes of heat and cold, vibration, and dust, odors, fumes, and pulmonary irritants. She can tolerate occasional exposure to weather, humidity, and wetness. The claimant can never operate a motor vehicle. In addition to normal breaks, she is expected to be off task five percent of the time in a normal eight-hour workday.

 (Tr. at 18-21, Finding No. 5).

At the fourth step, the ALJ found that Claimant could perform her past relevant work as an office manager. (Tr. at 21-23, Finding No. 6). In addition, the ALJ determined, with the help of a vocational expert, that Claimant was capable of performing other jobs that existed in significant numbers in the national economy. The ALJ considered that Claimant was a younger individual on the alleged disability onset date and subsequently changed category to closely approaching advanced age. (Tr. at 22). She had at least a high school education and communicated in English. Transferability of job skills was not material in Claimant's case, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of her transferable job skills. (*Id.*). After posing hypothetical questions to the vocational expert, which included Claimant's age, education, past work history, and residual functional capacity, the ALJ concluded that Claimant could perform unskilled light exertional level work, such as cashier and price marker. (Tr. at 23). Therefore, the ALJ found that Claimant was not disabled and, thus, was not entitled to benefits. (*Id.*, Finding No. 7).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant identifies two errors allegedly made by the ALJ, which require this court to reverse and remand the Commissioner's decision. First, Claimant argues that the ALJ failed to fully consider and evaluate the opinions of Claimant's treating

gastroenterologist, Dr. Timothy G. Harper;  in the alternative, Claimant argues that the ALJ failed to provide "good reasons" for rejecting portions of Dr. Harper's opinions. (ECF No. 12 at 5-9). Claimant specifically refers to a letter prepared by Dr. Harper in December 2016 in which he opined that Claimant's Crohn's disease caused her to have six to ten bowel movements per day despite treatment. As a result, Dr. Harper felt Claimant would need to be in close proximity to a bathroom and would likely require multiple unscheduled breaks during an eight-hour period. Given this scenario, Dr. Harper did not believe that employment was feasible for Claimant and opined that she should be granted permanent disability. According to Claimant, the ALJ summarily rejected Dr. Harper's letter as an opinion on an issue "reserved to the Commissioner" without fully and properly addressing the significant functional impairment suffered by Claimant, as described by Dr. Harper in his letter.

Second, Claimant contends that the ALJ failed to provide any explanation for his RFC finding that Claimant would be "off task" five percent of the workday. Claimant argues that without some rationale for the five-percent figure, this court is effectively precluded from conducting a meaningful review of Claimant's RFC finding. (*Id.* at 9-11). Claimant asserts that the five-percent limitation was reached by the ALJ without any apparent reliance on the medical evidence and absent any obvious analysis. Claimant suggests that the ALJ adopted the five-percent figure—as opposed to a greater percentage more consistent with the evidence—in order to achieve the desired result of nondisability. Claimant maintains that the RFC finding is not supported by substantial evidence and was reached in contravention of the SSA's rules and regulations establishing a "non-adversarial spirit." (*Id.* at 11).

In response to Claimant's challenges, the Commissioner points out that the ALJ

6

discussed Dr. Harper's letter at several places in his written decision and specifically considered Dr. Harper's opinion that Claimant would need to take more than the normal number of bathroom breaks during an eight-hour workday. (ECF No. 13 at 10-11). The Commissioner further argues that the ALJ arrived at the five-percent off task figure by taking into account the normal morning, lunch, and afternoon work breaks allowed at most office jobs and then by adding reasonable "off task" time to accommodate the more frequent bathroom time that Dr. Harper believed Claimant would require due to her Crohn's disease. In the Commissioner's view, the ALJ clearly explained his rationale for the five-percent figure and, in fact, relied on Dr. Harper's opinions when determining that limitation. Consequently, the Commissioner argues that there is no merit in either of Claimant's challenges.

## V.     Relevant Evidence

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A. Treatment Records

In March 2013, Claimant consulted with Dr. Nandini Kiri, an infectious disease specialist, for longstanding problems with skin irritations and recurrent staphylococcus infections. (Tr. at 296). Claimant provided a history of Crohn's disease for which she received Remicade every eight weeks. She had no history of surgeries. At that time, Claimant lived alone and operated a landscaping business. Claimant's physical examination was unremarkable, and she was showing clinical improvement on antibiotic therapy. (Tr. at 297). Dr. Kiri discussed with Claimant that Remicade was an immunosuppressant medication and might cause flare-ups of her underlying infection; however, as her infection was currently under control, she could resume Remicade

7

infusions. (*Id.*).

From April 17, 2014 through August 2014, Claimant saw providers at Lincoln Primary Care for general medical issues. (Tr. at 341-54, 503-14). On April 17, 2014, Claimant complained of knee swelling, leg spasms, and back problems. (Tr. at 341, 511). She reported having Crohn's disease and taking Remicade infusions every eight weeks. She was unemployed. Claimant stated that she had abdominal pain and frequent diarrhea, but had a normal appetite and no vomiting. (Tr. at 342, 512). On physical examination, Claimant appeared healthy and well-nourished. Her abdominal examination was normal. Claimant was referred to physical therapy for her musculoskeletal complaints and laboratory studies were ordered. (Tr. at 343, 513). On April 22, 2014, Claimant's knees were more painful and she was having a flare-up of her Crohn's disease. (Tr. at 346, 508-11). She was scheduled for a Remicade infusion the following day.

Claimant returned to Lincoln Primary Care on April 29, 2014 and indicated that she was feeling much better since receiving Remicade, although she still had abdominal pain and frequent diarrhea. (Tr. at 349, 505-08). Her laboratory results showed a B12 deficiency, so Claimant was scheduled for a B12 injection. She was also referred to an orthopedic specialist for the suspected inflammatory process in her knee. (Tr. at 508).

On June 20, 2014, Dr. Timothy Harper, a gastroenterologist, performed a colonoscopy on Claimant. (Tr. at 408-09). He noted that Claimant had been a patient of his in the past and had a longstanding history of Crohn's disease. He last performed a colonoscopy on Claimant in 2010. At that time, her left colon looked normal with no Crohn's ulcers, although her transverse colon had a few small ulcers at about 40 cm. Claimant subsequently moved out-of-state and was gone for several years. Now that she

had returned, Dr. Harper saw her in follow-up and ordered the colonoscopy. During the procedure, Dr. Harper observed large Crohn's ulcers in Claimant's rectal vault up to about 25 cm. At that point, small, more aphthoid ulcers were scattered throughout the rest of her left colon. (Tr. at 408). Claimant's transverse colon revealed a slightly strictured area, although it could be passed without significant force. There were tiny aphthoid ulcers in the cecum, with a normal terminal ileum.

Claimant returned to Lincoln Primary Care on August 20, 2014 with complaints of a sinus infection, joint pain, and morning stiffness. (Tr. at 352-53, 503-04). She had consulted with an orthopedist, who performed an MRI, which was normal. (Tr. at 353, 504). Claimant continued to receive Remicade for Crohn's disease.

On October 20, 2014, Claimant saw Dr. Ralph Webb, a rheumatologist at Marshall Health, for knee pain and swelling in the setting of Crohn's disease. (Tr. at 393-98). The pain was located in the right knee and first began about four weeks after a Remicade shot Claimant had received in March 2014. She described the pain as spreading to her left knee over the next ten days and manifesting as a tight pressure associated with swelling severe enough to interfere with range of motion. (Tr. at 393). The pain and swelling decreased when Claimant received the next Remicade infusion. Claimant indicated that her Remicade dosage had just been increased and the infusion schedule was accelerated from every eight weeks to every six weeks. She currently had no symptoms. Dr. Webb performed a physical examination that was unremarkable with no evidence of crepitation on range of motion, no range of motion limitation, and no inflammatory synovitis. (Tr. at 394). He diagnosed Claimant with Crohn's arthritis and surmised that the change in her Remicade dosage and timing might resolve some of her symptomatology. Dr. Webb decided to monitor Claimant by reevaluating her in two weeks when her symptoms would

normally be expected to return.

On October 23, 2014, Dr. Harper wrote a letter to Dr. Skaggs at Spring Hill Primary Care Physicians discussing Dr. Harper's visit with Claimant that day. (Tr. at 424). Dr. Harper stated that Claimant was "feeling much, much, much better." (*Id.*). Dr. Harper explained that Claimant had an abscess that was being treated with antibiotics and joint pain that was being addressed by more frequent and higher dosages of Remicade. Dr. Harper had some question about possible drug-induced lupus and mentioned that Claimant was consulting with a rheumatologist in Huntington, but Dr. Harper was unsure of what the rheumatologist had done to evaluate Claimant. (*Id.*).

Claimant presented to Lincoln Primary Care in February and July 2015 for various infections. (Tr. at 496-503). A review of systems was not recorded in February and the physical examination was limited. (Tr. at 501-02). However, Claimant denied having any abdominal pain or diarrhea in July, and her abdominal examination was normal. (Tr. at 498-99).

Dr. Harper performed a colonoscopy on Claimant on May 13, 2015. (Tr. at 462-63, 555-56). He noted that Claimant had "horrible punched-out ulcers in the colon" and her Remicade had recently been increased to every six weeks. (Tr. at 462). Dr. Harper observed during that procedure that Claimant had punched-out ulcers beginning at the anal region and continuing up to about 30 cm. There was also some mild narrowing. Above 30 cm, the colon looked fairly normal with just a few minimal patchy areas of redness on to the ileal opening, which had a ring of ulceration that prevented passage of the scope. Dr. Harper commented that Claimant did not have any signs of obstruction, however, and even reported eating nuts on a daily basis. He decided to add Imuran to Claimant's prescription of Remicade. (*Id.*).

In August 2015, December 2015, and March 2016, Claimant presented to Lincoln Primary Care with headaches and musculoskeletal complaints. (Tr. at 487-95). A review of systems was not recorded in August 2015 0r March 2016, and the physical examinations were limited. (Tr. at 492, 488-89). However, Claimant denied having any abdominal pain or diarrhea in December 2015, and her abdominal examination was normal. (Tr. at 495).

### B.  Functional Assessments and Medical Source Opinions

On October 9, 2014, Curtis Withrow, M.D., completed a Physical Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 71-73). He determined that Claimant could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had unlimited ability to push and pull up to the weight limits Claimant could lift and carry. Dr. Withrow felt that Claimant had some postural limitations in that she could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 72). Dr. Withrow did not feel that Claimant had any manipulative, visual, or communicative limitations, but thought she should avoid concentrated exposure to extreme heat and cold, vibrations, fumes, odors, dust, gases, poor ventilations, and hazards. Dr. Caroline Williams reviewed Claimant's file on December 11, 2014 and agreed with the RFC assessment prepared by Dr. Withrow. (Tr. at 85). Dr. Williams commented that new medical evidence in the file did not demonstrate any significant changes in Claimant's functional limitations.

On May 12, 2016, Dr. Harper wrote a "To Whom It May Concern" letter regarding his care of Claimant. (Tr. at 576). Dr. Harper stated that Claimant had suffered from

Crohn's disease for years and had been a difficult patient to keep under control. She had a longstanding problem with anal fistulas associated with Crohn's disease, which required multiple courses of antibiotics and numerous visits with surgeons. Dr. Harper described Claimant's Crohn's disease as "horrible." (*Id.*). He indicated that Claimant took the maximum dose of Remicade, both strength and frequency, and even that dosage did not keep her in ideal condition. Her most recent colonoscopy revealed significant ulcers in the left side of the colon with a narrowed ileocolonic anastomosis with ulceration. According to Dr. Harper, Claimant still had six to ten bowel movements per day, making her life "miserable." (*Id.*). Dr. Harper opined that Claimant was unable to work and needed to be on permanent disability due to her long history of Crohn's disease.

On December 1, 2016, Dr. Harper wrote a second "To Whom It May Concern" letter that repeated word-for-word a large section of the May 2016 letter and added that Claimant was also taking a second medication, Imuran, which had done little to improve her symptoms. (Tr. at 618). Dr. Harper indicated that if Claimant were to be employed, she would need to be in very close proximity to a bathroom and would likely require multiple unscheduled breaks in an eight-hour period to accommodate her disease. Dr. Harper opined that, in his view, Claimant still needed to receive permanent disability, and he urged the reader to award Claimant those benefits. (*Id.*).

### C. *Claimant's Statements*

On September 14, 2014, Claimant completed an Adult Function Report. (Tr. at 222-29). She indicated that her Crohn's disease limited her ability to work, because she never knew when she would have to use the bathroom. In addition, she had other conditions related to Crohn's disease; such as, staph infections, fevers, and extreme fatigue, that interfered with work. Claimant described her typical day as getting up,

making multiple trips to the bathroom in the morning, eating lunch, making more trips to the bathroom, cleaning house, making dinner, making more trips to the bathroom, and getting up at night to go to the bathroom. (Tr. at 223). Claimant had no trouble performing personal care, and she tended to a dog and two cats, although she stated that her mother helped her with her pets. Claimant cooked meals a few times per week, which she would eat throughout the week. She also cleaned, did laundry, and mowed the grass. (Tr. at 224). Claimant drove a car and went out three to four times per week. She shopped for groceries twice per week and was capable of paying bills and handling her money. (Tr. at 225). With respect to hobbies and social activities, Claimant stated that she liked to watch football on the weekends, text with friends, and go out to lunch with friends once per week. However, she indicated that her social activities had been substantially reduced due to her medical condition. (Tr. at 227). Claimant admitted that she could pay attention "all day," and had no problem following written or spoken instructions. She did not handle stress well and avoided public restrooms, which curtailed her social outings. Claimant explained that her Crohn's disease made it very difficult for her, because she was always concerned about whether she would make it to the bathroom when she needed one and was afraid to eat, because she worried about how the food would affect her. In addition, Remicade, the medication she took for her condition, caused skin irritation that led to staph infections. (Tr. at 229).

Claimant supplemented her Adult Function Report on November 12, 2014. (Tr. at 245-52). She complained of back pain and Crohn's disease, indicating that the Crohn's disease required her to use the bathroom multiple times throughout the day, and the need was always urgent. Consequently, she had to position herself near a bathroom at all times. Claimant stated that she could no longer work an eight-hour day due to fatigue caused by

13

multiple trips to the bathroom at night, as well as pain that kept her from sleeping. (Tr. at 246). Claimant could still perform daily personal care, cook, mow the lawn, clean the house, care for her pets, do laundry, drive, and shop for groceries. (Tr. at 246-48). She also watched television, used a computer, texted with her friends, and went out with them once per week. (Tr. at 249). However, she reiterated that Crohn's disease and the need to be near a bathroom were major impediments to living a normal life. (Tr. at 252).

Claimant testified at the administrative hearing on December 15, 2016 that she was first diagnosed with Crohn's disease in 2003. (Tr. at 39). At the time, Claimant was operating a landscaping business, but she was forced to close the business in 2004, because the Crohn's disease made her too sick to do the work. (Tr. at 40). From 2004 to 2011, Claimant worked part-time in her father's office doing payroll and accounts receivable. Claimant stated that her father was the local distributor of Snyder's potato chips. In 2007, while still working with her father, Claimant reopened her landscaping business, but closed it again in 2010. She eventually moved with her parents to Florida in 2011 when her father's business was purchased by Snyder Berlin. Claimant was employed briefly in Florida at a Home Depot, but stopped working in December 2013 due to increased issues with Crohn's disease. (Tr. at 42). Claimant testified that in 2013 and 2014, she had severe abdominal pain and cramping, and she would have to use the bathroom 20 to 25 times per day. (Tr. at 42-43). Each bathroom visit would last 15 to 20 minutes.

After Claimant began to receive Remicade infusions, her need to take bathroom breaks decreased to about eight to ten per day. (Tr. at 43). Claimant stated that she had to take precautions when she left home, such as carrying extra clothing and sanitary wipes, and making sure that she was always near a bathroom. Claimant also tried to adjust

her eating and drinking schedule to prevent attacks; although, she indicated that the episodes were random. (Tr. at 44). When asked by the ALJ, Claimant testified that she generally went to the bathroom upon awakening in the morning and would then have another seven to nine bowel movements during the next twelve or so hours. (Tr. at 46). Claimant stated that she usually did not have to get up in the middle of the night to use the bathroom.

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

Claimant's first criticism is that the ALJ failed to give proper consideration to the opinions expressed by Dr. Harper in his December 2016 "To Whom It May Concern Letter." As an alternative criticism, Claimant contends that if the ALJ actually did consider Dr. Harper's opinions, then the ALJ failed to provide good reasons for his apparent rejection of Dr. Harper's statements that Claimant would need to be located near a bathroom and would need to take multiple unscheduled breaks during an eight-hour workday. Claimant's second criticism is that the ALJ's RFC finding related to Claimant being "off task" five percent of the day was not based on any articulated evidence of record. Each criticism is addressed in turn.

### A.  *Dr. Harper's Opinion Letter*

In December 2016, Dr. Harper wrote a letter documenting that Claimant had a long history of Crohn's disease, which was (1) hard to control, (2) was associated with colonic ulcers and anal fistulas, (3) required medication and surgery, and (4) resulted in six to ten bowel movements every day. Based upon these clinical factors, Dr. Harper opined that if employed, Claimant would need to be in close proximity to a bathroom and would likely need multiple unscheduled breaks during an eight-hour workday. Dr. Harper further opined that, regardless, he believed Claimant needed to be awarded permanent disability benefits. (Tr. at 618).

In the written opinion, the ALJ explicitly referred to Dr. Harper's December 2016 letter. (Tr. at 20, 21). The ALJ noted Dr. Harper's report that Claimant had anywhere from six to ten bowel movements per day and would require additional time off task to facilitate restroom breaks necessitated by her Crohn's disease. (*Id.*). The ALJ also acknowledged Dr. Harper's opinion in both May and December 2016 that Claimant was unable to work

16

and needed to be on permanent disability. (Tr. at 21). The ALJ conceded that as Claimant's treating gastroenterologist, Dr. Harper's opinions regarding Claimant's functional limitations were entitled to some weight. Thus, taking into account the extra bathroom breaks Claimant would need, as indicated by Dr. Harper, the ALJ incorporated time off task into Claimant's RFC finding. (Tr. at 20, 21). In contrast, the ALJ did not give weight to Dr. Harper's opinion that Claimant could not work and needed an award of permanent disability, pointing out that opinions regarding a claimant's ability to work were not medical source opinions entitled to any special evidentiary weight; rather, they were administrative findings reserved to the Commissioner.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[1] and must explain the reasons for the weight given to the opinions.[2] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[2]2 Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.*

at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Here, the ALJ plainly considered the opinions provided by Dr. Harper and weighed them appropriately. Claimant's contention that the ALJ failed to consider the "probative portions" of Dr. Harper's December 2016 letter is factually incorrect. To the contrary, the ALJ gave the opinions "some weight." (Tr. at 21). As the ALJ explained, however, to the extent Dr. Harper believed that Claimant's need for proximity to a bathroom and extra bathroom breaks made her unemployable, that belief was not supported by other substantial evidence. Indeed, the vocational expert's testimony was significant evidence in support of the opposing conclusion.

The written decision reflects the ALJ's resolution of this issue. First, the ALJ considered the physical difficulties experienced by Claimant secondary to her Crohn's disease as those difficulties were described by Dr. Harper and corroborated by Claimant in her testimony. In the workplace setting, these difficulties manifested as the need to have more frequent bathroom breaks and ready access to a bathroom. The ALJ then translated Claimant's need for extra bathroom breaks into a measurable workplace limitation that could be incorporated into the RFC finding. The ALJ determined that Claimant's need for extra bathroom breaks amounted to her being off-task five percent of the time in addition to normal morning, lunch, and afternoon breaks. The ALJ then asked a vocational expert if there were jobs available in significant numbers in the national economy that a hypothetical individual with Claimant's RFC, work history, age, and education would be capable of performing. The expert answered that such an individual could perform Claimant's past work as an office manager, as well as at least two other

unskilled, light level exertional positions.

Accordingly, the ALJ did not err in his treatment of Dr. Harper's opinions. Taken as a whole, Dr. Harper's opinions were only entitled to "some" weight, because one portion of them—those related to claimant's employability—were not accepted by the ALJ, while another portion—those related to Claimant's functional limitations caused by Crohn's disease—were accepted by the ALJ. The ALJ gave substantial weight to Dr. Harper's statement that Claimant needed to have extra bathroom breaks; he simply disagreed that the extra bathroom breaks rendered Claimant unemployable. The ALJ explained his resolution of the issue as follows: "Dr. Harper reported that [Claimant] now has anywhere from 6-10 bowel movements per day ... While this is not an ideal situation, time off task in addition to normal morning, lunch, and afternoon breaks is reflected in the above-defined residual functional capacity." (Tr. at 20). Put simply, the ALJ accepted the functional limitation identified by Dr. Harper and accommodated for it in the RFC finding; despite the limitation, there were still available jobs that Claimant could perform.

Therefore, the undersigned **FINDS** that the ALJ properly considered Dr. Harper's treating source opinions and provided an adequate explanation for the weight given to the opinions. In addition, the undersigned **FINDS** the ALJ's assessment of Dr. Harper's opinions to be supported by substantial evidence.

### B.  RFC Finding

Claimant argues that the ALJ erred by failing to provide any logical explanation for how he determined that Claimant's need for extra bathroom breaks would result in her being off task five percent of the workday versus any other percentage. According to Claimant, there is no medical evidence to support that figure, and the ALJ makes no effort to cite to any other factual support. Claimant asserts that the lack of explanation frustrates

meaningful review and leaves the court and Claimant to wonder if the ALJ did not simply select the five percent figure to avoid awarding benefits to Claimant.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted). In Claimant's view, this case should be remanded, because the ALJ did not demonstrate in the written decision how the evidence supported his RFC finding.

An examination of the written decision, however, reveals the basis of the ALJ's five percent finding. After reviewing Claimant's history of Crohn's disease and noting the treatment she received, her ability to work while suffering from the condition, and its effect on her daily activities, the ALJ summarized that Claimant was diagnosed in 2003, worked pretty steadily until December 2013, and then experienced an acute exacerbation of Crohn's symptoms. (Tr. at 20). Claimant sought treatment from Dr. Harper, who increased Claimant's dosage of Remicade. By October 2014, Claimant was doing "much, much, much better." (*Id.*). The ALJ accepted Claimant's testimony at the administrative hearing, which was supported by Dr. Harper's statements in both the May and December 2016 letters, that Claimant's ongoing symptomatology caused her to have anywhere from

22

six to ten bowel movements per day. (*Id.*). The ALJ clearly explained in the written decision that in the normal course of business, Claimant would be entitled to a morning break, a lunch break, and an afternoon break, which would allow her time for three of those bowel movements. Assuming that Claimant would require another one or two bathroom breaks per workday, the ALJ included an additional five percent off task in the RFC finding to accommodate that need. (Tr. at 20). In support of this finding, the ALJ cited specifically to the Hearing Testimony. (*Id.*).

At the hearing, Claimant was asked detailed questions about how Crohn's disease affected her bathroom requirements. (Tr. at 43-48). Claimant testified that even with treatment, she had up to ten bowel movements per day, and each bathroom visit lasted approximately 15 to 20 minutes. (Tr. at 43-44). Claimant stated that she took precautions in the event she had an accident, such as carrying extra clothing and sanitary wipes; however, she did not wear special under garments, nor had her physician recommended them. (Tr. at 44). Claimant explained that she usually did not have bowel movements at night. Accordingly, the six to ten episodes typically occurred while she was awake, which she estimated was a twelve-hour period. (Tr. at 46). Claimant indicated that she always had a bowel movement immediately upon waking in the morning. (*Id.*). When asked by the ALJ, Claimant admitted that she could control her symptoms to a certain degree by adjusting the timing of her meals and by restricting the type of food that she ate. (Tr. at 47-48).

Based on this testimony, the ALJ determined that Claimant would need five percent of an eight-hour workday, in addition to her normal breaks, to accommodate her symptoms of Crohn's disease. Five percent of an eight-hour workday is 24 minutes, which according to Claimant's own testimony, averages out to one and half additional bathroom

breaks per workday. Given Claimant's testimony that at least one of her bowel movements occurred upon arising, and she had some ability to control her symptoms by manipulating her eating habits, the ALJ's five percent estimate was logical and was supported by substantial evidence.

In addition to the hearing testimony, the ALJ relied on Claimant's daily activities as evidence that she could do daily tasks on a sustained basis without constantly stopping to take a bathroom break. (Tr. at 20). By way of example, the ALJ referenced Claimant's representations that she could walk for up to an hour and a half at a time; sit for up to an hour at a time; go shopping, mow the grass, drive a car, meet friends for lunch, and go out five times per week. (*Id.*). The ALJ found these activities to be antithetical to Claimant's allegation of complete disability. (*Id.*).

Claimant may argue that the ALJ should have explicitly resolved the issue of how many bathroom breaks Claimant would require during an eight-hour workday; however, the ALJ's failure to do so was harmless error. At the hearing, Claimant's counsel presumed that Claimant would need two extra bathroom breaks during the workday, requiring her to be away from her work station 30 to 40 minutes in addition to her routine breaks. (Tr. at 61). Claimant's counsel asked the vocational expert a series of questions based on that presumption. While the vocational expert vacillated to some degree about the tolerances of individual employers, she ultimately testified that employers will usually tolerate an employee being off task up to ten percent of an eight-hour workday. (Tr. at 63). Ten percent of an eight-hour workday is 48 minutes, which would provide Claimant more than sufficient time to take two to three bathroom breaks in addition to the bathroom breaks already allowed with the standard breaks. Therefore, even assuming Claimant's more severe hypothetical scenario, substantial evidence supports the ALJ's RFC finding and his

ultimate determination that Claimant's need for more frequent access to bathroom breaks did not render her unemployable.

Thus, contrary to Claimant's representation that the basis for the ALJ's finding was unclear, a review of the record demonstrates that the ALJ's five percent figure was based entirely upon a reasonable estimate of the time that Claimant spent in the bathroom combined with the number of bathroom visits she typically made during her waking hours, taking into account her testimony, her reported activities, the medical information related to Crohn's disease, Dr. Harper's statement, the number of hours in a workday, and the number of waking hours left in the day outside of work. When piecing this evidence together, the ALJ's conclusion that Claimant would require time for a total of four to five bowel movements while at work was imminently reasonable.

Accordingly, the undersigned **FINDS** that the basis for the ALJ's five percent finding is explained in the written decision and the five percent figure is supported by substantial evidence. As such, the ALJ did not err in his determination of Claimant's RFC.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section

636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: October 19, 2018

Cheryl A. Eifert
United States Magistrate Judge